Good morning. Linda Lai for Plaintiff Appellant ATU 192. On behalf of all plaintiffs' appellants, I'd like to reserve eight minutes for rebuttal, please. May it please the Court. Plaintiffs' appeal focuses on MTC's $10.5 billion transit expansion program, by which MTC made a long-term financial commitment to actually get the projects, the expansion projects it selected for inclusion in the program, built. There are two aspects of the expansion program that are especially notable, and I'd like to explain this morning why these two aspects of the program, A, with respect to our intentional discrimination, precluded the grant of summary judgment. The District Court weighed the evidence. B, with respect to our disparate impact discrimination, precluded the District Court from finding MTC to have met its rebuttal burden. This is because it analyzed only defendants' ends and not its means. And finally, C, with respect to also the disparate impact, showed that plaintiffs correctly establish a prima facie case. Sotomayor Are you still arguing intentional discrimination? Lai Yes, Your Honor. Sotomayor I thought you'd waived it. Lai No, we have not waived it. It was a summary judgment was granted on our intentional discrimination claim, and we have also appealed that. The two aspects of the Resolution 3434 that are especially notable are this. First, MTC failed to adhere to its own selection criteria in determining what projects to include and at what level. Second, in selecting a slate of expansion projects, MTC chose a slate of projects that was dramatically, by any measure, skewed towards rail, which benefits a disproportionately white population, while excluding and reducing funding for bus, which benefits a disproportionately minority population. Starting with the intentional discrimination claim on which the District Court granted summary judgment, the District Court committed clear, reversible error because it weighed the evidence. Plaintiffs introduced evidence on each of the Arlington Heights factors that could have supported an inference of discriminatory intent, and yet the District Court granted summary judgment on the ground that the record contained, quote, contraindications of intent. On its face, the District Court weighed the evidence and made the inference that no discriminatory intent existed. That is not an appropriate rule for a court at summary judgment. Roberts. Well, that's certainly common law before us. But I was looking, you know, in most of these cases we have come along, somebody, a hiring person said, I don't like blacks or I hate people south of the border, and we have some smoking gun that we... What are the statements you claim that were in the summary judgment that made an issue of fact that had to go to the fact finder? Direct evidence has never been a prerequisite to surviving summary judgment, Your Honor, and that's in Ninth Circuit precedents such as Lindsay. Okay. Give me some indirect evidence, then, that shows intent. So, for example, failure to adhere to one's own selection procedures in LAM and in LO or applying malleable criteria subject to manipulation, this is evidence that supports an inference of discriminatory intent. Here with MTCs... If they decide something which later turns out to be demonstrated to be discriminatory, then that's an inference that they did it not by mistake or otherwise, but they did it because they are discrimination... Correct. ...intentionally. ...potentially manipulating the process, and those would be facts for a fact finder to conclude at trial. Evidence to this effect included MTC's failure in the expansion program to adhere to its own criteria. For example, it went through an elaborate process of publicly enumerating selection criteria, but then chose projects that did not discernibly meet those criteria. For example, it fully funded two BART projects, two rail BART projects, even though on four out of the ten criteria, they lacked sufficient information even to be scored, and then on five out of the remaining six criteria, they scored low or no, yet these were somehow included in the expansion program. At the same time, AC Transit, a bus provider, submitted a slate of projects. Only 20% of the funding for AC Transit projects was included. Okay, so you have a bunch of these projects. Usually there's depositions taken of the people who said, why did you do that? And then we look at the evidence, and does this show discrimination? Because there could be other reasons other than discrimination. You have to get across that hump. Absolutely. Were there depositions taken of decision makers? There were. And one of the reasons, for example, that was given that AC Transit projects were not included was that they didn't come to the table with enough funding. That underscores a fact dispute about pretext, because the very reason for 3434 was to look to get extra funding, to get funding for projects that didn't have it, to establish regional priorities. MTC itself said, as long as it's in 3434, we will keep looking for the funds to get it built. So if the point of 3434, the expansion program, was to look for new funds for expansion projects so that they could get built, it's entirely inconsistent to reject a project because it didn't have full funding. So the inferences that you, one, have drawn and you think you have drawn to go to a fact finder is that this shows discrimination on the part of the decision maker. Correct. This was pieces of the evidentiary record that supported an inference of discriminatory intent. In addition to MTC's selection process of transit expansion projects within Resolution 3434, there was ample evidence of MTC's disparate treatment of bus projects, bus needs, and rail expansion. There was evidence that MTC responded to minority community transit needs through a delay in study tactic akin to a buck passing designed to maintain the status quo. There was evidence that its so-called equity analyses were designed from the start to paper over the very kinds of disparities that minority communities were most concerned about and that had long asked MTC to analyze. There was evidence that MTC rejected the recommendation of its own advisory committee and went out of its way to cover up the data, cover up data that cast it in a bad light. All of these procedural departures, substantive departures from decision making norms are the type of evidence that could have supported an inference of discriminatory intent. Yet the district court ignored this and weighed a few stray facts to conclude that there were, quote, contraindications of intent. That is something that should have been done at trial, not at summary judgment. When we talk about disparate impact, that was a trial to the bench, so the judge is entitled to weigh the evidence. With respect to our disparate impact claim, but not with respect to the disparate treatment claim. I understand. I'm changing the subject now to the disparate impact. Could you tell us why the judge was clearly erroneous in the findings that she made? She was clearly correct in finding a prima facie case, and she was erroneous in finding MTC to have met its rebuttal burden. Let me start with the second. The law is clear, California Code of Regulations 2 CCR 7286.7, that a disparate impact rebuttal burden requires a defendant to satisfy two criteria. One, it has to state an overriding legitimate business purpose, and two, it has to show that the means deployed, the challenged practice, here MTC's subjective selection process, actually or effectively fulfills that purpose. The district court erred because it looked only to the first part, whether MTC had proffered a legitimate goal. It engaged in no analysis whatsoever of whether MTC's selection process furthered that goal, and the record shows that it did not. For example, one of the proffered goals of the expansion program was to reduce congestion, and yet MTC made no effort to determine whether the rail projects it included in the expansion program actually reduced congestion. One MTC official, when questioned whether the rail projects actually reduced congestion, responded, quote, the degree to which it happens, who knows. Therefore, MTC selected rail projects purportedly to reduce congestion, yet itself it had no idea whether those projects, which disproportionately benefit white riders, actually reduced congestion. Also, the selection criteria. MTC is certainly entitled to establish regional priorities. That is the point of the Metropolitan Planning Commission, the Metropolitan Planning Organization, to establish regional priorities. Presumably the criteria that it established for selecting projects embodied those regional priorities. They included such things as system connectivity, land use. These were regional priorities that MTC could legitimately have set, and yet MTC then selected a slate of projects heavily tilted towards rail, which did not further these criteria. Again, for example, the two BART projects, which rated low or no on five out of ten criteria, and couldn't even be scored on four out of ten. If MTC, if the criteria embodied the regional priorities that MTC was trying to further or to promote in adopting the expansion program, the slate of projects it ultimately selected failed miserably in accomplishing that goal. The problem with the district court's analysis is that it failed to engage in the second part of the test. Do the means actually further the end? However stringent a standard this court adopts for the rebuttal burden, however stringent or however deferential, MTC cannot satisfy it because there was no analysis of the means here. And I would just emphasize that while MTC complains that this would, a review of its conduct would unduly hamstring governmental actors, that is far from the case. All this would do, a two part rebuttal burden, apart from being correct under the law, under governing California regulations, all this would do is require a governmental entity such as MTC, once a disparate impact has been shown, to demonstrate that its practices actually effectively or in some fashion serve a government purpose. All we're asking is that this court review, is that the Federal courts review that when a government entity is saying that it's going to do something, that it actually do something. This is a familiar role of the courts in enforcing anti-discrimination laws, and it is particularly important in a case like this where there are critical public transit service, services at issue, services in which the public. I have a question. Yes. You've jumped over this one and I want to give you a chance to answer it. I'm not convinced that the court was right on the disparate impact. Okay. And the reason is not that you didn't put a lot of evidence. The reason is that I don't think it was a statistically correct analysis. Now, for example, we have the Robinson case. Are you familiar with Robinson? Is there's, I know there's a Robinson case out of Kansas. I'm sorry. No, it's out of Orange County, Robinson against Orange County. It's a great case. It's well written. It's from our court. In Robinson, there was a certain percentage of blacks that was indicated in the county. The county had a different percentage of blacks, and so there was a case brought, and the court decided, we decided there was not disparate just on those gross statistics. And the reason was that they would get the wrong pool. They've got a gross pool of all of Orange County instead of people who would be present, who would want the jobs. Now, I think the mistake has been made here, that the data that you're relying upon is ridership throughout all, whoops, through all of San Francisco County. Again and again, we find out about how many, what the gross percentage is of ridership on buses and rail. But that isn't the point. The point to me is, and you can correct me if I'm wrong, the point to me is each one of these projects has to be determined as to what effect it will have on minorities. For example, your projects going across the Bay is going to affect whites more, get more white ridership. But if you extended into Chinatown, you'd get more minorities. So I don't think the impact has been shown. I think the statistics of relying on what ridership and buses and trains are throughout San Francisco County, San Francisco area, doesn't tell us what is the impact going to be for the individual projects. Yes. If I may respond, Your Honor, I think a recent case of this court, also very well-written opinion, CCCIV Modesto, was involved various neighborhoods in the Modesto area in which to determine whether they should be annexed as part of a master tax-sharing agreement. The court in that opinion emphasized that it is important to look at the demographics of each neighborhood overall. You don't break down the various individuals within the neighborhood, but just look at the percentages of the neighborhoods at issue. So starting with that, beginning with there as a starting point, by analogy, we have, there are two ways to look at the disparities here. One is regional bus ridership statistics and regional rail ridership statistics. The district court, I'll just set forth the argument, the district court made the determination to look at bus and rail on the whole. This was not an abuse of discretion under Keith v. Volpe, also a precedent of this court in a disparate impact Fair Housing Act case. The district court determined the impacted universes and made determinations about what the likely universe was, and this court reviewed for abuse of discretion. We respectfully submit it was not an abuse of discretion to determine that the likely benefits of rail projects, because the expansion program deals with regional rail projects, are regional riders, and that the likely benefits of bus projects are regional. So you don't think you're required to take the individual projects and find out what impact they have? You could use the projects of data from across the entire area? If we, we'd be delighted to do it that way, and it would show a greater disparity. The projects that were disproportionately excluded were dominated by AC Transit, which has a 78 percent minority ridership, so the disparity figures would only skew greater. That's fine if you prove it, but because all of the AC projects are that way doesn't mean that this individual project isn't different. And I'm just wondering if you've sufficiently tailored your statistics to be able to demonstrate what's necessary in light of Robinson. We would respectfully submit that that's not necessary under CCCI v. Modesto, which looked at the sort of overall neighborhood comparisons by analogy here, transit operators, and then also under Keith v. Volpe, that the determination about the likely beneficiaries is reviewed for an abuse of discretion. If I may reserve the remaining time for my rebuttal. I have some questions. Maybe you can extend your rebuttal, but these are basic questions that aren't very much litigated on appeal, but I am interested in the, you created this minority by putting together various ethnic groups. Now what's your best authority for saying you can do that? I believe that there are Federal Title VI regulations. I'm happy to submit a subsequent authority in a 28-J letter to the Court. Now if you add up all these different ethnic groups, what percentage of San Francisco County do they come to? It is true that the No, what do they come to? That was not the question. The question is what do they amount to? I don't recall that factor. Well, if you're going to call them a minority, don't they have to add up to less than 50 percent? Well, both Federal and State law protects individuals on the basis of race. Yes, but you're protecting them on the basis of a composite of races. Yes, that's correct. I'll tell you this, as someone who came here from the East, I am not aware of great racial distinctions in this community. All these categories seem to come out of the Old South or something like that. That's not the way people in San Francisco think. I don't think people think he's black, he's Chinese, he's Hispanic. No, that's not the normal way of civility in this community. And these are racial things imposed upon this community. So I'm very skeptical of the whole idea of a minority. But will you furnish the breakdown that you think is important and what they add up to in San Francisco County? Yes, Your Honor. Thank you. May I respond briefly and reserve some time for rebuttal? Thank you. We'll give you a couple of extra minutes. Thank you. Good morning. Good morning, Your Honors. May it please the Court, my name is Kimmon Manolis and I represent Apelli Metropolitan Transportation Commission, and that's MTC. First, I want to thank the Court and my opposing counsel and their clients for moving the date of this hearing from November until today. I had lost both my parents in the ten weeks prior to that hearing, so I do appreciate that and I wanted to thank everybody. I wanted to spend a few minutes, Your Honors, kind of taking this back out to 30,000 feet for the Court, because I think we often lose context when we're hearing appellants' arguments. MTC has an enormous statutory role. It oversees transportation policy in the county. It's a designated recipient of federal funds and state funds in some instances. It sets policy through a 19-member board. Its board is represented throughout all the counties and also federal, state, and regional agencies. Its nine-county jurisdiction includes 101 cities with three airports, five ports, highways, bicycle and pedestrian routes, train service and bus service. There are 26 operators in this region, 26 transit operators, that is. There's no one dominant city here. San Jose, Oakland, San Francisco are all in this region. There are more transit needs than there are funds. That was very well established at trial. And over the next 25 years, the Bay Area is going to add 2 million more residents, which obviously make transportation important, growth of transportation and connectivity very important. The systems within the transportation community are complementary. AC Transit, for instance, connects with nine other bus systems and 21 BART stations and six Amtrak stations. BART operates in four counties, 43 stations. VTA operates bus and light rail in Santa Clara County, while Caltrain serves rail riders in three counties, San Francisco, San Mateo, and Santa Clara. The transit ridership in the Bay Area is incredibly diverse. It's majority-minority, 61 percent. And the top seven operators, which was the... What does that mean, majority-minority? There are 61 percent minority riders on all Bay Area transit. Did I answer your question, Your Honor? I think so. Okay. So, for instance, while AC Transit has a 78 percent minority ridership and Golden Gate Transit, which is another bus operator, has a 38 percent minority ridership, BART has a 53 percent minority ridership. So when we think about suburbs and white communities, it's really not true in this area. VTA, again, the Santa Clara County Transit Agency has a 70 percent minority ridership, and MUNI has a 58 percent minority ridership in San Francisco. The funding landscape is, frankly, a morass. There are federal funds, state funds, and local funds that are all that issue that MTC has to deal with. They can't be moved around. It's an absolute zero-sum game. So, for example, most federal funds are capital, and even though some of those can be used for capital and rehab, MTC prioritizes rehabilitation in those funds. There was a great record set up at trial about what could be done with state funds, to the extent state funds can be used for operations, MTC prioritizes operations, and actually it was shown that AC Transit does quite well in the operations area. And then finally, Your Honors, local funds, state sales tax, I'm sorry, county sales taxes, and transit fares, MTC has no control over where those can go, and that's a very important fact, as we'll see. A couple of themes. Basically, the appellants here seek to place the needs of one transit operator over all others, and they never identified where the money could come from. It's a zero-sum game. So if MTC takes money from one operator to give to another, it has to come from somewhere, and there's a great deal of non-discretion that MTC has in terms of what it can do. Secondly, and I think as the Court has noted, the metrics for this case, either on the intentional case or the disparate impact case, have been a moving target, and were never really set, and the court found that they were, the district court found that they were not persuasive. And finally, I think what the appellant class is really... Robertson One of the points Ms. Lye made was that the, was that Judge LaPorte weighed evidence with respect to the motion for summary judgment. What's your response to that? Lassner Judge LaPorte did no such thing, Your Honor. What Judge LaPorte did was she can take these Arlington Heights factors and determine whether they create an inference of discrimination, and what she said was they did not. So, for instance, this delay tactic, for instance, on the Lifeline program, which I believe what Ms. Lye was suggesting, you know, MTC on its own accord, there was no requirement that it did it. In 2001, it started a Lifeline program, which was basically to say, okay, let's look at our own transportation system, let's see what areas are underserved, and let's figure out the best way to address those needs. And, again, there was no requirement that MTC did that. What Judge LaPorte found was that the fact that Lifeline may not have had as much money as rail expansion did not raise an inference of discrimination. Why? Because rail expansion comes with Federal earmarks that MTC does not have. MTC does not control, whereas Lifeline requires operating money, which MTC has to find, beg, borrow, and steal for, to set up so that it can, and that's why the evidence of trial showed there were a couple hundred million dollars this year, and an increase of $400 million in 2006, and then, finally, before trial, $700 million to Lifeline. But that's MTC trial. We're talking about problems you have in the rail line. It is a very complicated system. I think it's a good system. I ride it every day. But that doesn't answer the question. You have a great problem to do, but you can't discriminate when you do it, and that's the issue we have before us. Exactly, Your Honor, and I don't think there was any showing that MTC did any discrimination. In fact, we have the concession that there was certainly no direct evidence of discrimination, so then you have to go to the Arlington Heights factors. And what Judge LaPorte found was that the inferences that the plaintiffs were trying to draw could not be drawn from the facts that they were presenting. So there was not a weighing. So your answer to the argument was she was not fact-finding. She was saying there's no reasonable inference, therefore there's no facts to find. There's no reasonable inference and then no factual dispute. Yes, Your Honor. So they say that she couldn't make that determination. That had to go to a fact-finder. She could not move over that and grant summary judgment. Well, ultimately, that fact-finder would be her, because she was going to be the trial judge, and she was the trial judge. But that doesn't answer the question. She cannot do it at that stage on summary judgment if there's disputed facts, disputed material facts, that a fact-finder should do. Then they have a chance of calling witnesses and doing other things rather than just on a record. Of course, Your Honor. But again, she did not find that there were factual disputes. She just found that the facts that were proffered did not raise the inference. So what you're saying is that her determination was that there's no material facts in dispute to keep me from deciding this issue in summary judgment? That's correct, Your Honor. Could we enlist your views on whether or not the district judge was correct in finding there was disparate impact found here in this case? I have indicated why I have some problems with that, and a case was cited to me that solved that problem, CCCI, but I thought that was a statute of limitations case, and I'll have to go back and reread it. I don't remember it being other than statute of limitations. Yes, Your Honor. So you want me to address whether there was a prima facie case made? Yes. And the difficulty I have is using gross statistics instead of statistics that are tailored to the particular extensions that are being approved. That's my difficulty. And, Your Honor, we certainly urged that at trial, and we were unsuccessful. Threshold issue. You know, bus riders are not a protected class. And also, it's based on a real misunderstanding of how Resolution 3434, which is this expansion program, how it works. MTC invited a call for projects. MTC doesn't do the projects. The project sponsors are responsible for project funding and delivery. There's no question of that at trial. What that means is, and the big concern that the appellants seem to have, is these giant BART projects. Well, BART did not proffer the giant BART project, and the one I'm talking about specifically is BART extension from Warm Springs to San Jose. Now, I personally find it hard to question that connecting the largest city in the region to the BART system is anything other than reasonable, but the BART project was the Santa Clara County's transit operator. That's VTA. That's a 70% minority operator, okay? AC Transit's a 78% minority operator. So, MTC looks at this, has a project that, frankly, has funding, okay, because why? VTA went to its voters, the Santa Clara County voters, with two separate ballot measures for half-cent sales tax to fund this. That's $3 billion. Plus, they secured state grants and federal grants out of the control of MTC to put together this $4 billion project. So, when we look at that, and then I know I want to get to your numbers question, Your Honor, that $4 billion was put in the rail ledger, which is just simply wrong, because of what it should have been done. It said, this 70% operator is proffering this project, and that $4 billion should have been moved to, if you want to say, a high majority, I'm sorry, a high minority percentage operator. That would have been more proper. We made that point at trial, but the judge didn't accept it. But I will say, in her order, she realized that that should be in a different column, but she never did the math. And if you do the math and you pulled out all the projects, as we showed in our brief, and I think it's page 72, you would have about $10 billion out of the $13 billion going to really high minority operators. For these expansion projects. How do you know that it is if there isn't statistics that show the minority population in that particular area? There's a case that comes out of southern Texas, where they divided up the city, it had to do with waste disposals, into four quadrants. The district judge tossed those statistics, but when we got the census statistics, he could find out exactly what was going on, and he found that the minorities were being disposed of, and they thought the statistics would show minority disadvantage. The actual statistics by census, so they could go right to the nub of it, showed just the opposite. There's been no findings that I know of, where each one of these proposals, that there's been any type of statistical analysis, for example, census statistics, that was used in the south Texas case. Now, that case has been cited by over 100 law reviews, so the idea is not one that's unique to south Texas. So my question is, is what they did here a workable substitute for what I thought, under Robinson, we would have to use? I think there was a reliance, Your Honor, on the profferer of the project, that the project was necessary and needed in its community. And as VTA, for instance, does serve a 70% minority population, I don't think it would be a good idea to use it. I think there was a presumption by MTC that that was a project that would benefit the riders of VTA. But we don't know that, because we don't know where each one of those projects will go and whether it will or won't. Well, we know where they're going to go. In the gross statistics, but that's what Robinson says you can't do. Right, and the evidence, I don't want to say that the evidence did not exist. It was not adduced at trial. It may be that in the studies for the Bard Extension VTA's project that those statistics were made, but it was not adduced at trial. Well, how do you respond to the CCI citation of your adversary? CCI is an interesting case. It had a number of different pieces to it. It was an annexation case. I've misplaced it. If you're not ready on that, don't waste your time. We did address it in our brief. I apologize, I just don't have it at my fingertips. I wanted to go to the burden, because for the first time in their appellate brief, the appellants raised these two cases. California regulations, the 7000 series, and suggesting that they absolutely meant incorporation of these employment discrimination standards for the burden shifting in this case. And I just want to submit to the Court, that just cannot be. The incorporation in Section 98-400 of the regulations, I don't know if you've heard of it. It does allow that incorporation, but not if it's inconsistent with the definitions in the rest of the regulations. And the definitions are at 98-010. To employ this strict standard in the following areas I just think is unworkable. Employment or goods, procurement of goods and services, training, health, welfare, housing, financial aid, procurements of loans. So that would prove to be very problematic, but even 98-400, which is I believe what appellants are basing their argument that the 7200 series can be incorporated, say, if a conflict exists between the definitions in the industrial relations and employment discrimination regs and chapters one through four, and the definitions I just read were from chapter one, that the definitions in chapter one through four prevail. So, in other words, if it's not, if those don't prove usable, you wouldn't use them. You'd go back to our Title VI jurisprudence. If there are no questions, and if you're done, that's fine. Your Honor, I would actually like to address standing with it briefly. Oh, shucks. You know, AC Transit, which again is kind of the basis of the class, the class was the minority riders of AC Transit, is an independent entity. It's not a party. It has its own board of directors. These are all undisputed facts. It determines all questions of its policy, its budget, including its service types, levels and fares. Its operating revenues come from, you know, property tax, parcel taxes and fares. And its local statutory funds don't provide as much support for it as do the other operators. And again, these are the funds that are totally outside of MTC's control. So, in other words, Santa Clara VTA has sales taxes in its county that fund its transit. AC Transit doesn't have nearly that kind of help from its county, through no fault of MTC. And what the evidence on summary judgment and a trial showed was that the funds over which MTC had discretion, it did better for AC Transit than for other operators. The other facts that were important here that were, again, were undisputed, that we have AC Transit as a third party, the third party outside the litigation, and we have the fourth party, which is the economy. And the judge specifically found that the economy has an enormous effect on transit, the condition of transit operators. Why? Because when the economy goes down, when there's a recession, sales tax revenue goes down, which means that the support for transit goes down. Similarly, when folks lose their jobs, they don't have to ride transit as much to get there. Throughout the litigation, in, say, 2002, 2003, every operator had service cuts. And so, when you look at the third party standing cases, and you're looking at the causation prong, the appellants are required to make a stronger showing than they would normally. And here, we had not only a third party, but the fourth party, which is the economy. And, again, these were facts that the district court found. So it was, I'm not arguing with her fact-finding, but more with how she applied those facts to standing. I thought Your Honor was going to have a question, so I... No? Okay. And then, with regard to redressability, what the evidence of trial showed was that AC Transit already runs commuter service, Transbay, across the bridge, 13 and 20 percent of vehicle revenue, hours and miles. And, in closing argument, the appellants' counsel asked the judge for $20 to $40 million for AC Transit. And that would easily be taken up with regard to the Transbay service if AC Transit chose not to run it. And, moreover, AC Transit had committed $57 billion to the Transbay terminal project in capital funds. So, again, these are things that MTC can't control, but it goes to redressability as well. Because even if there were somehow, there could be the issuance of an order here, and I don't know, frankly, what it would look like, that AC Transit already is not doing some things for the appellants that maybe the appellants would like, and there's no guarantee that AC Transit would do so with any kind of order from this court. Okay. Thank you, Your Honor. Ms. Lai, how about three minutes in rebuttal? Thank you very much. I have four points I'd like to address. I'd start with the prima facie case in disparity. With respect to Judge Wallace's questions about whether it should be broken down by the particular project set issue, that was never an issue that MTC raised at trial. The question was always over which operator to use, the demographics of the operator that would actually run the service, or the operator that was the so-called fiscal sponsor of the service. In some instances, for example, Caltrain, some of the projects involved upgrading their service. MTC argues that the sponsor, other agencies, should be the relevant demographic. But in fact, if Caltrain is upgrading its service, the likely beneficiaries are the people who are already riding the service. And so the district court implicitly found, let's look at the actual people who ride now. The district court relied, true, on regional bus and rail riderships. We think there was no clear error there. If one went to an operator-specific analysis, the disparity figures would skew even greater, because AC Transit has such a high minority percentage. It was never raised below that it should be broken down at the specific project level. With respect to our summary judgment claim, MTC itself has argued that basically the judge concluded that inferences should not be drawn. Well, that's precisely what should not be done by a judge at summary judgment. And I would like to emphasize that on its face, it's apparent that the judge drew inferences by referring to, quote, contraindications. And the judge can't say the following facts don't give rise to sufficient inferences? No, a judge can do that for certain. Certainly, but the type of evidence that we introduced here is exactly the type of evidence that other courts have found to preclude summary judgment. For instance, failure to adhere to one's own selection criteria, broken promises, and like. In addition, one of the very facts cited by the district court as a so-called contraindication actually gave rise to a fact dispute. The district court noted that MTC had on occasion provided allocations of so-called preventative maintenance funds to AC Transit to assist it with its operating budget. That was the district court's finding in the summary judgment trial. And that this constituted so-called assistance. At trial, the district court found that these very same allocations, because of the specific nature of the transactions, did not result in a net gain of operating revenue. And that can be found at ER 259. Therefore, the very same transactions that she cited as, quote, assistance, did not turn out to be assistance after trial. So there was a fact dispute. And one of the very facts she relied on in granting summary judgment. I just wanted to ask you, Mr. Eminolius made the point, he said he couldn't envision what an order in your favor would look like. If you were to prevail, what would you expect the judgment to say? On the disparate impact claim? Yes. Or either, for that matter. I mean, what would you have the court order at the end of the day? Well, we bifurcated liability and remedy. So with respect to the disparate treatment claim, we should have gone to trial. And then the order would depend on what happened at trial. With respect to our disparate impact claim, the only issue on appeal is the expansion program. Many of the issues that MTC has muddied the water with involve operating funds. I'm not making myself clear. What would you have the judge order they do? Adopt multimodal fair objective scoring criteria or some criteria other than its haphazard selection process to which itself it did not adhere? Come up with new regulations, basically. A fair and objective scoring process for selecting transit expansion projects. I see you're out of time. Thank you. Can I ask you a question? Sure, of course, Judge Lee. I'm still trying to understand the basics of this case. And I think you may have assumed that everybody agreed, so you didn't need to explain  But how did you get appointed as representing this coalition of ethnic groups? The plaintiffs consist of individual bus riders, minority bus riders who use and rely on A.C. Transit. There are also two organizational plaintiffs, A.T.U. 192 and Communities for a Better Environment, which have associational standing because their members also use and rely on the bus. So they were said to be representatives of these different groups? Yes. The parties stipulated to class certification. So that was all right. Well, they are. If I may also address the concern Your Honor raised in my opening comments about the overall demographics of San Francisco. It is certainly true that the Bay Area, as Mr. Manolius referred, is a majority minority district, a so-called majority minority district. But that is not dispositive here. The question in terms of disparity in any kind of disparate impact case is proportionality and imbalance. And therefore, one has to compare the relative populations at issue. Rail is at least 15% more white than bus and at least 10% more white than transit riders generally. In addition, California has been a majority minority district since the year 2000. If one could not find disparate impact where there is a baseline majority minority, that would effectively render entirely meaningless California Government Code 11135 and its implementing regulations. I'm estranged. Thank you. Thank you too, Mr. Manolius. The case is just argued and submitted. We will stand at recess for this session.
judges: Wallace, Noonan, Silverman